**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 92-5165**
_____

**WILLIAM T. MOHAM,**

**Plaintiff-Appellee,**

**VERSUS**

**STEEGO CORP., ET AL.,**

**Defendants,**

**STEEGO CORPORATION,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Western District of Louisiana**
_____

(September 27, 1993)

Before REAVLEY, DUHÉ, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

In this Title VII case, the only issue on appeal concerns the denial of the equal opportunity to seek employment; and that issue turns on whether a selling company can be held liable for the discriminatory acts of its supervisors committed while in the employ of the seller, but while acting for the benefit of the purchasing company. Because we conclude that such liability would push beyond the limits of applicable general agency principles, we **REVERSE** that part of the judgment appealed from.

I.

Nabors Trailers, Inc., a subsidiary of Steego Corporation, manufactured and distributed trailers through its facility in Mansfield, Louisiana. Early in 1988, it stopped manufacturing, maintaining only its parts, shipping and service departments.

The repair shop was part of the service department. William T. Moham, who began his employment with Nabors in 1966, worked in that shop. In June 1988, Moham (age 58) and four others were working under the supervision of foreman Tommy Mason and service department supervisor Joe Leone. Three of Moham's co-workers were white; Moham and one co-worker were black. All three whites received raises that month; neither Moham nor his black co-worker did.

On August 23, 1988, pursuant to an agreement signed that July 1, Nabors sold its assets to Mansfield Industries, Inc., which assumed operation of the business the next day.[1] In the weeks prior to the sale, Mason had made applications for employment with the new company (Mansfield) available to the repair shop employees. All except Moham were interviewed and assured that they would maintain their positions after the sale.[2]

As Moham left work on Tuesday, August 23, at approximately four o'clock, Mason told him that, if the sale took effect that

---

[1] Mansfield Industries took the name "Nabors Trailers". We refer to it as "Mansfield".

[2] Wilfred Woods, the other black working in the repair shop, suffered a job-related injury after he submitted his application. As a result, he was not on the job when the sale took place, but was interviewed and hired when he returned after the sale.

night, Moham would no longer have a job; otherwise, he should report to work as usual. When Moham asked for an explanation, Mason said that Moham had failed to turn in his application. Moham offered to go home, get the application and return it immediately. Instead, Mason gave Moham his paycheck, and instructed him to turn in his application at the Louisiana Job Service office.

Within an hour, Mason had telephoned a friend, who was white, and suggested that his 19-year-old son come to the plant for an interview. And, by six o'clock that day, the friend's son had been hired to fill Moham's position and report to work the following day for the new company. The next morning, Moham returned and met with Leone, who again told him that he must apply for a job through the Louisiana Job Service.

After filing a complaint with the EEOC for age and race discrimination, Moham was issued a right to sue letter; and suit was brought against, *inter alia*, Mansfield and Steego, Nabors' parent. Because of its bankrupt status, Mansfield was dismissed, pursuant to joint motion. And, because Nabors and Steego had merged, the parties agreed that Steego would be liable for any discriminatory acts by Nabors.

After a short bench trial, the district court found Steego liable for the discriminatory acts which deprived Moham of both the June pay raise ($320 in damages) and the opportunity to seek employment with Mansfield (net damages of approximately $37,000). The court also found that Moham had not established age as a motivating factor in those discriminatory acts.

3

II.

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. states that it is an unlawful employment practice for an *employer* to

> fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). Steego does not challenge the pay raise ruling; it appeals only the finding that Mason and Leone violated Title VII and the conclusion that they did so as its agents. Because only the liability of Steego (Nabors), the selling company, is in issue, we need not reach the issue of discrimination, unless Steego can be held liable for it. Therefore, we address the latter issue first.

But, for a full understanding of this issue, we need to present briefly the claimed discriminatory acts. And, in order to do that, we must note quickly that the burden of proof for § 2000e cases, articulated in **McDonnell Douglas Corp. v. Green**, 411 U.S. 792 (1973), has been recently reaffirmed and clarified in **St. Mary's Honor Center v. Hicks**, ___ U.S. ___, 113 S. Ct. 2742 (1993). As is well known, the plaintiff must first establish a prima facie case of discrimination. If he does, he has created a presumption of discrimination, *see* **Texas Dept. of Community Affairs v. Burdine**, 450 U.S. 248, 254 (1981); and the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the challenged action, **McDonnell Douglas**, 411 U.S. at 802. If the

4

defendant meets this burden by presenting evidence which, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action", *St. Mary's*, ___ U.S. ___, 113 S. Ct. at 2747 (emphasis omitted), then the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden, which has never left him:  that of proving that the defendant intentionally discriminated against him, *see id*.

And, the trier of fact must still answer that ultimate question of discrimination, even if the defendant's explanation has been rejected.  As explained in *St. Mary's*, that rejection is not, in and of itself, a finding of intentional discrimination.  "[A] reason cannot be proved to be a `pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason".  *Id*. at ___, 113 S. Ct. at 2752 (citation and emphasis omitted).

The defendant's proffered reason for hiring the 19-year-old white, and not considering Moham for his old position with the new company, was that he did not apply for it.  When asked if Moham was not hired because he failed to turn in his application, Mason testified that Moham was rejected "[s]olely on that basis".  In addition to finding Mason's testimony "unconvincing", the court found Moham's testimony "credible" and obviously believed that he had specifically asked for permission to submit his application before leaving work on August 23 -- *before* Mason solicited an application from his friend's son.  Certainly this is a finding

5

that the defendant's proffered reason is false.  (This finding is supported by the testimony of a white co-worker of Moham's, who testified that Mason told him in June 1988 that "he was maybe gonna have an all-white shop, get rid of all these blacks".)  The court went on to make the required finding on the ultimate question: "Mr. Moham, a black man, was discriminatorily denied an equal opportunity to seek employment with the new company".

Therefore, assuming that Mason and Leone did discriminate in this fashion against Moham on the basis of his race, we must determine whether Steego can be held liable for that discrimination.  On this issue, the district court concluded:

> Tommy Mason and Joe Leone were employees of Nabors ... at the time the discriminatory acts occurred, were being paid by Nabors ... and were acting within the purview of their employment as supervisory personnel of Nabors. ... Their actions in denying Moham the equal opportunity to seek employment with the new company [Mansfield] were clearly within the scope of their employment.  An employer is liable for the discriminatory acts of its personnel.

Needless to say, we freely review this conclusion of law.

For the definition of "employer", 42 U.S.C. § 2000e(b), Congress includes "any agent of such a person".  Because of such use of the term "agent", instead of "employee" or "supervisor", for example, the Supreme Court has interpreted this provision to mean "that Congress wanted courts to look to agency principles for guidance in this area".  ***Meritor Sav. Bank, FSB v. Vinson***, 477 U.S. 57, 72 (1986).  The Court noted that although "common-law principles [of agency] may not be transferable in all their particulars to Title VII, Congress' decision to define `employer'

6

to include any `agent' of an employer ... surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." **Id.** In its ruling, the Court cited the Restatement (Second) of Agency. **Id.**

Section 219 of the Restatement provides that a master is liable for the acts of his servants "committed while acting in the scope of their employment". A servant's conduct is within the scope of his employment if

> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits; [and]
>
> (c) it is actuated, at least in part, by a purpose to serve the master.

Restatement (Second) of Agency § 228(1).

Parts (a) and (b) are not at issue; it is uncontested that Mason and Leone were authorized to hire repair shop employees for Nabors and that their acts took place on Nabors' property during working hours. The final element, however, cuts against Steego's liability, and is decisive.

Consistent with the above quoted § 228, Restatement § 235 provides that conduct is not within the scope of employment if it is not performed for the purpose of serving the master. The comment explains that the rule applies

> although the servant would be authorized to do the very act done if it were done for the purpose of serving the master, and although outwardly the act appears to be done on the master's account. *It is the state of the servant's mind which is material.* ... Conduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master.

7

Restatement (Second) of Agency § 235 cmt. a. (emphasis added).

As stated, we find this agency principle applicable and controlling. Mason and Leone took applications and interviewed potential employees *for Mansfield*, the purchasing company. The applicants were already employed by Nabors. Interviewing them for positions with a successor company might have been "actuated ... by a purpose to serve" the predecessor (Steego/Nabors) if it had contracted to have a work force in place, or if the sale was more likely to take place, or at a higher price, if the work force remained. But, there was no such evidence. In fact, John Lowrey, a representative of the purchaser, testified that Mansfield was "buying assets, and it was up to us to make them productive. [Steego] didn't care whether we did or not." He further testified that the ongoing service department had no effect on the price Mansfield was willing to pay: "[A]s far as Mansfield was concerned, ... [Nabors] was closed down. It was nice that there were a few people hanging around, but it didn't help us any, didn't add anything."

However, Lowrey did meet with Nabors' middle management in July or August and make it known that Mansfield wanted to start operations as soon as possible after the sale. It is unclear how, or when, these middle management employees were hired by Mansfield. In any event, Bobby Dillard, Nabors' plant superintendent, testified that "we all felt that the ones that were called at the meeting at Mr. Lowrey's would be involved with the [new] company".

8

And, it is uncontested that "[m]iddle management was largely the same for [Steego/Nabors and Mansfield]."

Although he could not recall any discussion about having a work crew ready to start after the sale, Dillard testified that "it was kinda understood". And, at some point after the meeting with Lowery, Mason and Leone began distributing applications and conducting interviews. (Leone attended the meeting with Lowrey. Mason did not. Mason testified that his instructions to make the applications available came from Leone.) Dillard testified that, about three days before the August 23 sale, he also became involved with getting a crew together. He testified further that no one with Nabors or Steego consulted him, directed him, or had any connection with this effort. Dillard confirmed that his actions were "just an effort to assist the new owners in starting up".

In asserting that the discriminatory acts are nonetheless attributable to Steego, Moham relies upon **Sibley Memorial Hosp. v. Wilson**, 488 F.2d 1338 (D.C.Cir. 1973) and a line of similar cases. **Sibley**, however, does not involve an agency question. Rather, it notes that Title VII prohibits an employer from discriminating against "any individual", and holds that, under its plain meaning, a plaintiff may sue one who interferes with his access to employment, even if he is not the plaintiff's direct employer. The question here, however, is not whether Steego could be liable under Title VII if its agents had interfered with Moham's access to employment. Rather, the question is whether Mason and Leone were, in fact, acting as Steego's agents while hiring repair shop

9

employees for the new company.  We conclude that they were not. Instead, they were acting solely for the benefit of Mansfield; and, therefore, their discriminatory acts cannot be attributable to Steego, the selling company.[3]

III.

Accordingly, that part of the judgment appealed from (equal opportunity to seek employment) is **REVERSED**, and judgment is **RENDERED** for Steego on that issue; and this matter is **REMANDED** for such further proceedings as may be necessary.


   **AFFIRMED in Part, REVERSED and RENDERED in Part, and REMANDED**

---

[3]   As alternative bases for Steego's liability, Moham seeks assistance under theories of equity and of Steego (Nabors) and Mansfield "be[ing] considered brother-sister corporations for acts of discrimination occurring during the transition period". Neither theory has merit.  The former is, in fact, no more than a misguided deep pocket approach; the cases relied on concern successor liability, while here it is the predecessor that Moham seeks to hold liable.  And, the latter theory is not supported by the record.