Kenneth W. AUSTIN, et al,

v.

Ralph MABEY, as Bankruptcy Trustee of Cajun Electric Power Cooperative, Inc., et al.

No. 00–728–D–1.

United States District Court, M.D. Louisiana.

Dec. 20, 2001.

Dawn N. Guillot, Baton Rouge, LA, for plaintiffs.

John Conway Miller, Jennifer Aaron Hataway, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, for Ralph R. Mabey, defendant.

Robert B. Worley, Jr., Jennifer Lynn Anderson, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Louisiana Generating, L.L.C., defendant.

Robert B. Worley, Jr., Jennifer Lynn Anderson, Michele Whitesell Crosby, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for NRG Energy, Inc., defendant.

Dawn N. Guillot, Baton Rouge, LA, for Roger Morgan, Robert Perkins, Theodore Plauche, Vaughn Reynolds, Charley Saizan, Thomas Palko, John Nichols, Doleem Lemoine, James Didier, Beverly Carnes, Anthony McMinn, Frank Neely, Joseph Lea, Emmitt Cavalier, William Geismer, Jess Hohnhorst, David Duval, Dickie Hunter, Ronald Lewell McCabe, Allen Hetherwick, Laura Dabney, Ronald Saizon, Barbara Dickerson, Jeanette R. Johnson, Melinda Delhoste, Karen Herpich, Debra Jackson, Malcolm Stutes, Jesse Jarreau, Michael Armato, Dennis Johnson, Paul Dewey, Clifford Nelson, Kenneth W. Austin, James Gordon Chustz, defendants.

### *RULING ON MOTION FOR SUMMARY JUDGMENT*

RIEDLINGER, United States Magistrate Judge.

This matter is before the court on a motion for summary judgment filed by defendant Ralph Mabey, as bankruptcy trustee of Cajun Electric Power Cooperative, Inc. (Cajun). Record document numbers 22–25, 38. The motion is opposed. Record document number 28–31.

Cajun filed for bankruptcy in December 1994. Cajun was maintained as an ongoing business while the trustee attempted to sell the company's assets. Ultimately, a bid to purchase Cajun's assets by Louisiana Generating, L.L.C. (LaGen) was accepted and incorporated into a plan of reorganization which was confirmed by the bankruptcy court in October 1999. Also in October 1999 four of Cajun's senior vice presidents accepted offers of employment with LaGen, effective April 1, 2002. These

persons were responsible for recommending to LaGen which Cajun employees would be offered jobs with LaGen. These four, as well as all other Cajun employees, continued to be employed by Cajun until their employment with Cajun officially ended on the closing date of the asset sale which was March 31, 2000. After the closing date Cajun ceased all business operations. On April 1, 2000, the generating plants and other assets were owned by LaGen, and all former Cajun employees who accepted employment with LaGen became its employees.[1]

It is undisputed that Cajun's vice presidents, and other Cajun supervisory employees assisting them, were acting as agents for LaGen when recommending which Cajun employees should receive offers of employment with LaGen. Nor did the parties dispute that the Cajun vice presidents who made employment recommendations to LaGen were engaged in the type of conduct they were employed to perform, and that they did so during their normal work hours as Cajun employees.[2] Plaintiffs argued that these Cajun employees also acted as agents for Cajun when making the employment recommendations since their purpose, in part, was to serve Cajun. The question is whether the evidence relied upon by the plaintiffs is sufficient, under the applicable law, to create a genuine dispute for trial on this issue. A careful review of the summary judgment evidence leads to the conclusion that a reasonable jury could not find in favor of

the plaintiffs on this issue. Therefore, Cajun's motion for summary judgment is granted.

### Procedural History

Plaintiffs in this action are 35 individuals who were formerly employed by Cajun who have brought claims based on age, gender and race discrimination under 42 U.S.C. § 2000e (Title VII), and 29 U.S.C. § 623(a)(1), the Age Discrimination in Employment Act (ADEA), against Mabey, LaGen and NRG Energy, Inc. Plaintiffs also invoked the court's supplemental jurisdiction over state law claims for employment discrimination, breach of contract, intentional infliction of emotional distress, negligence, abuse of rights, detrimental reliance, negligent misrepresentation, and breach of the duty of good faith and fair dealing.[3]

Defendant Cajun moved for summary judgment because the undisputed facts in the record establish that, in the context of their claims, Cajun was not their "employer" as that term is defined under Title VII and the ADEA. Defendant also argued that the record contains no evidence from which a reasonable trier of fact could conclude that Cajun discriminated against the plaintiffs based on their age, gender or race. In support of the motion, the defendant relied upon a statement of uncontested material facts, and excerpts from the deposition testimony of A. Kell McInnis,[4] Alan D. Williams,[5] Victor Elmer,[6] John Brewster,[7] and copies of documents filed in

---

1. Record document number 24, defendant's statement of uncontested material facts, numbers 1, 2, 3, 4, 6, 8, 17, 19 and 20. Plaintiffs did not contest these material facts. Record document number 28.

2. Record document number 30, plaintiff's opposition memorandum, p. 14.

3. Plaintiffs' initial complaint and first supplemental and amending complaint, record document numbers 1 and 5.

4. Defendant's exhibit A.

5. Defendant's exhibit B. Williams was LaGen's president and in charge of overseeing the transition from Cajun to LaGen.

6. Defendant's exhibit C.

7. Defendant's exhibit D.

the Cajun bankruptcy proceeding.[8] In a reply memorandum, the defendant also submitted the deposition of plaintiff Anthony W. McMinn,[9] and another excerpt from the deposition of Williams.[10]

Plaintiffs asserted that there is sufficient evidence in the summary judgment record to create a genuine dispute for trial on the question of whether the defendant satisfies the definition of an employer under Title VII and the ADEA. Plaintiffs also argued that if summary judgment is not appropriate on this threshold issue the court should defer ruling on the defendant's second basis for the motion until all the relevant merits discovery is completed. In opposition to the motion, the plaintiffs offered a statement of contested material facts, the affidavit of McMinn,[11] and excerpts from the deposition testimony of Daniel MacLeod,[12] Brewster,[13] Elmer,[14] McInnis,[15] and Michael Manning.[16]

### *Summary Judgment Standard and Applicable Law*

Summary judgment is only proper when the moving party, in a properly supported motion, demonstrates that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the moving party carries its burden under Rule 56(c), the opposing party must direct the court's attention to spe-

cific evidence in the record which demonstrates that it can satisfy a reasonable jury that it is entitled to verdict in its favor. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. This burden is not satisfied by some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions or only a scintilla of evidence. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). In resolving the motion the court must review all the evidence and the record taken as a whole in the light most favorable to the party opposing the motion, and draw all reasonable inferences in that party's favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. The court may not make credibility findings, weigh the evidence, or resolve factual disputes. *Id.; International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir.1991), *cert. denied,* 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992).

■ The substantive law dictates which facts are material. *Canady v. Bossier Parish School Bd.,* 240 F.3d 437, 439 (5th Cir.2001). In this case the court must apply the statutory definition of an employer under Title VII and the ADEA, as well as the agency principles used to determine whether a predecessor company should be held liable for alleged discriminatory conduct. Both statutes define an "employer" as a "person engaged in an industry affecting commerce ... [and] any

---

8. Defendant's exhibit E, TRUSTEE'S MOTION FOR ENTRY OF ORDER APPROVING MODIFICATION OF SEVERANCE PAY POLICY AND EMPLOYEE RETENTION PROGRAM FOR NON–BARGAINING EMPLOYEES; Defendant's exhibit F, ORDER GRANTING TRUSTEE'S MOTION FOR ENTRY OF ORDER APPROVING MODIFICATION OF SEVERANCE PAY POLICY AND EMPLOYEE RETENTION PROGRAM FOR NON–BARGAINING EMPLOYEES.

9. Defendant's exhibit 1.

10. Defendant's exhibit 2.

11. Plaintiff's attachment 6.

12. Plaintiff's attachment 1.

13. Plaintiff's attachment 2.

14. Plaintiff's attachment 3.

15. Plaintiff's attachment 4.

16. Plaintiff's attachment 5.

agent of such a person." 29 U.S.C. § 630(b); 42 U.S.C. § 2000e(b). Plaintiffs and defendant agree that the principles set forth by the Fifth Circuit in *Moham v. Steego Corp.*,[17] govern the court's summary judgment inquiry. In *Moham*, the court relied upon *Meritor Savings Bank*, the Supreme Court decision which concluded that Congress wanted courts to look to common law agency principles for guidance in interpreting the definition of employer under Title VII:

> Congress' decision to define 'employer' to include any 'agent' of an employer ... surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible.[18]

The agency principle relevant to the court's analysis here is that of "scope of employment":

> Section 219 of the Restatement provides that a master is liable for the acts of his servants "committed while acting in the scope of their employment". A servant's conduct is within the scope of his employment if
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits; [and]
>
> (c) it is actuated, at least in part, by a purpose to serve the master.

Restatement (Second) of Agency § 228(1).[19]

■ In the context of a claim based on unlawful discrimination, the court must focus on the allegedly discriminatory acts rather than acts for which the master is liable but which are not alleged to be discriminatory. *See, Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408 (discussing employer's liability for alleged sexual advances by supervisor); *Moham*, 3 F.3d at 875–76 (discussing employer liability for supervisor's assumed racially discriminatory employment recommendation); *O'Keefe v. Varian Associates, Inc.*, 1998 WL 417498, *3–4 (N.D.Ill. July 23, 1998) (addressing employer's liability for allegedly discriminatory hiring recommendations of agent).

■ The third element of the restatement principles governing scope of employment is further explained in Restatement § 235 which provides that conduct is not within the scope of employment if it is not performed for the purpose of serving the master. As explained in the comment to the article:

> although the servant would be authorized to do the very act done if it were done for the purpose of serving the master, and although outwardly the act appears to be done on the master's account. *It is the state of the servant's mind which is material* .... Conduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master.
>
> Restatement (Second) of Agency § 235 cmt. a.[20]

### *Analysis*

■ The undisputed facts provide the background information necessary to understand and resolve the legal issues presented by the defendant's motion for summary judgment.

---

**17.** 3 F.3d 873, 876 (5th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994).

**18.** *Moham*, 3 F.3d at 876, *citing, Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986).

**19.** *Moham*, 3 F.3d at 876.

**20.** *Id.*

As summarized above briefly, the bankruptcy court approved the sale of Cajun's assets to LaGen. The asset sale did not require Cajun to hire employees for LaGen or to otherwise have a workforce in place on April 1, 2000. Cajun was required only to maintain its own workforce through the closing date of the asset sale on March 31, 2000. After the bankruptcy court approved the asset sale Williams, the president of LaGen, offered employment with LaGen to McInnis, Cajun' senior vice president and corporate counsel, Brewster, Cajun's vice president of production, Manning, Cajun's vice president of planning, rates and risk management, and Elmer, Cajun's vice president of operations. These vice presidents accepted the offers of employment from LaGen. After they accepted offers of employment with LaGen, Williams requested them to recommend which Cajun employees should be offered employment with LaGen. A vice president not personally familiar with the employees in his supervisory chain either did not make a recommendation or asked for recommendations from other supervisory personnel.[21]

In support of their position the plaintiffs relied upon the affidavit of McMinn and excerpts from the deposition testimony of MacLeod, Elmer, Brewster, McInnis and Manning. Their testimony can be summarized as follows. When they participated in making recommendations to LaGen executives as to whom LaGen should make offers of employment, part of their reason for acting was to fulfill Cajun's duty to cooperate under the purchase agreement which had been approved by the bankruptcy court. They acted in part to benefit Cajun in the bankruptcy by insuring an orderly takeover of operations by LaGen.[22]

This evidence does not contradict or negate the undisputed fact that the employment recommendations which the plaintiffs claim were discriminatory were made by Cajun employees for the benefit of the purchasing company, LaGen. Furthermore, the plaintiffs failed to present sufficient evidence to preclude summary judgment on the other circumstances cited in *Moham* which might prove a purpose to serve Cajun. The court in *Moham* suggested that if the selling company had contracted to have a workforce in place, or if the sale was more likely to take place, or at a higher price, if the workforce remained, then the predecessor company's agent might have been actuated by a purpose to serve his employer when allegedly discriminatory hiring recommendations were made.[23] This language is probably dicta since the appellate court concluded there was no evidence that the predecessor company had contracted to have a workforce in place or that the sale would have been affected if the predecessor's workforce remained. Nonetheless, the evidence in this case, as in *Moham*, does not show that Cajun contracted to have a workforce in place after March 31, 2000, or that the sale itself or the sale price would be affected if Cajun's workforce remained after March 31, 2000. In fact, the undisputed evidence is clearly to the contrary.

Plaintiffs' reliance upon the deposition testimony cited, sections 3.1 and 3.2 of the purchase agreement, and the announcement memo in October 1999 is unavailing.[24]

---

21. *See,* defendant's statement of uncontested material facts, ¶ 10.

22. Plaintiffs' attachment 1, MacLeod's deposition, pp. 77, 78, 105; plaintiffs' attachment 2, Brewster's deposition, pp. 79–81; plaintiffs' attachment 3, Elmer's deposition, p. 66; plaintiff's attachment 4, McInnis' deposition,

pp. 82, 83; plaintiff's attachment 5, Manning's deposition, pp. 51–53.

23. *Moham,* 3 F.3d at 876.

24. Memorandum signed by MacLeod and Williams dated October 18, 1999, announcing job offers to Brewster, Elmer, Manning, and

The only reasonable inference which could be drawn from this evidence is an intent by the Cajun vice presidents to cooperate with LaGen—for its benefit—during the transition period from the approval of the asset purchase agreement to the date of the sale, and to help LaGen select the employees it needed to run the company after the closing date—again, for its benefit.

For example, section 3.2(a) of the purchase agreement sets forth Cajun's obligation to retain the employees necessary to conduct the business until the closing. The very next phrase makes it clear that LaGen had the sole discretion to determine whether Cajun employees would be employed with LaGen after that date.[25] Although Cajun had to cooperate with LaGen so that LaGen could choose its employees to run the company after the sale, Cajun's cooperation does not equate to a responsibility of Cajun or its agents to have a workforce in place on April 1, 2000. Plaintiff failed to identify any language in the agreement that assigned responsibility to Cajun for determining the employees that would continue working after the company was acquired by LaGen.[26] Along with the contract, uncontradicted deposition testimony showed that LaGen was in charge of having its organization and employees in position for April 1, 2000. Plaintiffs failed to explain how this evidence, or evidence of an intent to serve Cajun in the bankruptcy proceeding, translated into some contractual or other

duty to establish a workforce for LaGen. Cajun's duty to cooperate with LaGen during the transition period simply did not include making any employment recommendations—recommendations which the plaintiffs allege were discriminatory.

There is also no evidence that the sale of Cajun's assets was more likely to take place, or at a higher price, if its workforce remained. For example, there was no evidence presented regarding the negotiations leading up to the agreement, or evidence that the agreement was contingent upon Cajun's employees making commitments to continue employment with LaGen. The uncontradicted evidence showed that LaGen made offers to the Cajun vice-presidents and individuals they recommended because LaGen's officers believed Cajun had good employees. If offers to Cajun employees were rejected, LaGen would ultimately go outside Cajun to fill the positions LaGen deemed necessary to run the business after the closing date.[27]

Plaintiffs' argument that Cajun had a monetary incentive to cooperate in LaGen's hiring of Cajun employees is also unconvincing. The evidence the plaintiffs relied on was part of the arguments included in the trustee's motion to persuade the bankruptcy court to approve changes in Cajun's severance pay policy.[28] Plaintiffs pointed to no evidence in the record which showed that this information impacted the negotiations or sale between LaGen and Cajun, or influenced the Cajun employees

McInnis. Plaintiff's attachment 2, exhibit 5 to Brewster's deposition.

25. "... [P]rovided that nothing herein shall be deemed to affect Generating's right, in its sole discretion, to determine whether any employee will be employed by Generating after the Closing Date...." *See,* Section 3.2(a), FIFTH AMENDED AND RESTATED ASSET PURCHASE AND REORGANIZATION AGREEMENT. Plaintiff's attachment 4, exhibit 1 attached to McInnis' deposition.

26. *See, O'Keefe,* 1998 WL 417498 at *5.

27. *See,* plaintiffs' attachment 1, MacLeod's deposition, pp. 23, 24, 105, 106, 124; plaintiffs' attachment 4, McInnis' deposition, pp. 108, 110, 111; defendant's exhibit B, Williams' deposition, pp. 40–42.

28. Defendant's exhibit E, paragraph number 35. The motion was filed about two years before the bankruptcy court approved the asset sale.

who made employment recommendations to LaGen.

Plaintiff argued that the present case can be distinguished from *Moham* because the sale here involved a utility in bankruptcy, and some of the supervisors who made recommendations had not received offers from LaGen.[29] As in *Moham,* this case involves the sale of an ongoing business. It is also undisputed that even the Cajun employees making recommendations who had not received employment offers knew they were making the recommendations for the benefit of LaGen, and that these individuals were directed to do so by supervisors who had accepted employment with LaGen. Plaintiffs failed to explain how the fact that this case involves a utility in bankruptcy, or that some Cajun employees participating in the selection process had not received employment offers, warrants a different result than that reached by the Fifth Circuit in *Moham.*

The summary judgment record establishes that the evidence relied on by the plaintiffs would be insufficient to satisfy a reasonable jury that the Cajun employees were acting within the scope of their employment with Cajun when they made employment recommendations to LaGen. Therefore, defendant is entitled to judgment as a matter of law on the issue of its status as an employer under Title VII and the ADEA.

■ Based on the resolution of the threshold issue of the defendant's status as an employer, it is unnecessary to address or decide whether the record contains evidence sufficient to preclude summary judgment on the ultimate issue of discrimination.[30]

Accordingly, the motion for summary judgment filed by defendant Ralph Mabey, as Bankruptcy Trustee of Cajun Electric Power Cooperative, Inc., is granted, dismissing the plaintiffs' claims under 42 U.S.C. § 2000e and 29 U.S.C. § 623(a)(1).

---

**29.** *See,* for example: McMinn's affidavit; plaintiffs' attachment 2, Brewster's deposition, pp. 82, 83, 135, 136; plaintiffs' attachment 3, Elmer's deposition, pp. 42, 43; plaintiffs' attachment 4, McInnis' deposition, pp. 100, 101; plaintiff's attachment 5, Manning's deposition, pp. 66, 67.

**30.** Evidence of an adverse employment action is one of the elements of a prima facie case of employment discrimination. *See, Ross v. University of Texas at San Antonio,* 139 F.3d 521, 525 (5th Cir.1998); *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 406–07 (5th Cir. 1999). Plaintiffs asserted in their opposition memorandum that Cajun was partially responsible for discrimination in failing to extend job offers, or extending less favorable job offers based on age, gender or race. Yet, it is undisputed that Cajun could not make employment offers since after the closing date it would no longer exist as an employer. In these circumstances it is unclear what adverse employment action could be attributed to Cajun. Realistically, the act of discrimination alleged by the plaintiffs is LaGen's failure to hire them. *See, McCann v. Texas City Refining, Inc.,* 984 F.2d 667, 674 (5th Cir. 1993).