IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 23, 2008

Charles R. Fulbruge III
Clerk

No. 06-31199

HARRELL SHARKEY

Plaintiff-Appellant

V.

DIXIE ELECTRIC MEMBERSHIP CORPORATION

Defendant-Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:04-CV-423

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

In this "reverse race discrimination" action, plaintiff-appellant Harrell Sharkey, who is white, alleges that defendant-appellee Dixie Electric Membership Corporation ("DEMCO") engaged in racially discriminatory hiring practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., when it failed to hire him for a vacant position even though he was qualified and instead hired an African-American applicant. Sharkey contends that he was informed by DEMCO personnel that his application was futile

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

because the vacant position was reserved for African-American applicants only. The magistrate judge granted summary judgment in favor of DEMCO and dismissed Sharkey's suit.[2] Sharkey now appeals. Because we conclude that DEMCO's Affirmative Action Plan provides a legitimate, nondiscriminatory rationale for its decision to hire the African-American applicant instead of Sharkey, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to Louisiana Revised Statutes § 12:401, DEMCO was created in 1983 as a private, nonprofit electric membership serving customers in the Parishes of East Baton Rouge, West Feliciana, East Feliciana, Livingston, Ascension, St. Helena, and Tangipahoa. DEMCO receives financial assistance in the form of low-cost loans from the Rural Utilities Service ("RUS") of the United States Department of Agriculture.

On December 30, 2002, DEMCO's General Manager, Henry Locklar, authorized the utility's Human Resources Manager, Diana Martin, who supervises and controls DEMCO's hiring process for vacant positions, to fill the position of Lineman Helper for the Greensburg District Office, which had become vacant on November 8, 2002. On January 2, 2003, DEMCO issued a "Notice of Job Vacancy" to its employees and, later that week, placed an advertisement concerning the vacant position in two newspapers – the Baton Rouge Sunday Advocate and the St. Helena Echo.

DEMCO received forty applications for the Lineman Helper position, including an application from Sharkey. DEMCO's hiring process requires applicants to take the Test of Adult Basic Education ("TABE") and basic

---

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed in this matter before a magistrate judge.

Aptitude Test Batteries ("ATBs") to be considered for certain job lines, including this Lineman Helper position. Test-takers receive scores of "high," "medium," or "low," but, according to DEMCO, only candidates who receive "high" or "medium" scores are considered for interviews based upon their qualifications. An applicant's race does not appear on his application. DEMCO only learns of an applicant's race at the time of an interview, if it elects to interview that applicant.

Sharkey received a "medium" score on the tests, but he was not selected for an interview for the Lineman Helper position. Ultimately, on July 14, 2003, after DEMCO interviewed eleven applicants, including two African-Americans, it hired Theodore McCray, Jr., an African-American candidate who was qualified for the position. McCray scored a "medium" on the tests, had an engineering and electronics background with previous experience in the wireless communications field, was an engineer in training, was a native and resident of Greensburg, had a clean driving record, and had previously worked at DEMCO in the summer of 1990 as a substation technician.

In this suit, Sharkey alleges that, in failing to hire him for the vacant Lineman Helper position, DEMCO engaged in racially discriminatory hiring practices in violation of Title VII of the Civil Rights Act of 1964 and Louisiana's employment discrimination law, Louisiana Revised Statutes § 23:332.[3]

---

[3] Sharkey initially filed a discrimination complaint against DEMCO with the EEOC, alleging unlawful and racially motivated hiring practices, which was dismissed. Through that complaint, Sharkey exhausted the administrative remedies required by 7 C.F.R. § 15.6. See 7 C.F.R. §§ 15.1, 15.2, 15.6 (requiring any person who believes himself to be subjected to discrimination prohibited by the Code of Federal Regulations to file with the Secretary of Agriculture or any agency, which includes any service, bureau, agency, office, administration, instrumentality of or corporation within the U.S. Department of Agriculture, extending federal financial assistance to any program or activity, a written complaint regarding the alleged discrimination).

Specifically, Sharkey contends that he was not hired because he is white, even though he was otherwise qualified for the position. He asserts that, after applying for the position, he was instructed by two members of DEMCO's board of directors, Richard Sitman and Joe Self, as well as other current and former DEMCO employees that his application was "futile" because the Lineman Helper position was specifically reserved for an African-American applicant. DEMCO, on the other hand, argues that it considered Sharkey's application, but decided to hire McCray based upon his qualifications and background, plus the fact that he is African-American helped DEMCO achieve projected minority hiring goals set forth in its Affirmative Action Plan.

Since at least 1984, DEMCO has annually adopted and implemented an Affirmative Action Plan ("AAP") prepared by Affirmative Action Plan USA, Inc.[4] DEMCO contends that, in these AAPs, its minority placement and hiring goals are evaluated and updated on a yearly basis. Relevant to this appeal, DEMCO had in effect an Affirmative Action Plan from September 1, 2002, to August 31, 2003 ("subject AAP") entitled "Equal Employment Opportunity Affirmative Action Program under Executive Order 11246 as Amended." The subject AAP noted that the "major problem areas which currently exist are in the recruitment

---

[4] Because DEMCO receives federal financial assistance from RUS, it must comply with the non-discrimination provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq, and Executive Order 11246, 30 Fed.Reg. 12319 (1965). As we have previously stated, regulations promulgated under Executive Order 11246 require federal contractors to "analyze the representation of . . . racial . . . minorities among their employees and, if the analysis reveals 'underutilization' of a particular group, to develop an affirmative action program that ordinarily would include numerical goals and timetables by which the contractor's progress can be gauged." Nat'l Bank of Commerce of San Antonio v. Marshall, 628 F.2d 474, 475-76 (5th Cir. 1980); see also United States v. Miss. Power & Light Co., 638 F.2d 899, 905 (5th Cir. 1981) ("[Executive Order 11246] states that, with a few exceptions [which do not apply here], all government contracts shall include a clause requiring the party contracting with the government to take affirmative action to increase the hiring of members of racial minorities and other traditionally disadvantaged groups.").

4

of qualified minorities in the Laborers job group," which includes the Lineman Helper position. The subject AAP stated that there were eleven persons employed in the Laborers job group at the time the subject AAP was prepared. Of that total, one (representing 9.1 percent of the total) was a minority. As compared to the availability of minorities having the requisite skills in the reasonable recruitment area, minorities were found to be underutilized by 33.4 percent, or by three minorities. DEMCO therefore projected the hiring of two minorities by August 31, 2003, provided there were openings and the minorities were otherwise qualified. According to the subject AAP, "the ultimate goal . . . is to eradicate any deficiencies that pertain to minority . . . placement."

On April 29, 2005, DEMCO filed a motion for summary judgment seeking to have this matter dismissed on the grounds that Sitman and Self did not have actual or apparent authority to make the alleged statements, such that they are not imputable to DEMCO, and that the subject AAP provided a legitimate, nondiscriminatory reason for hiring a minority to fill the Lineman Helper position. On August 25, 2005, the magistrate judge found that Sitman and Self were not actually or apparently authorized to make the statements in question and such statements are therefore not imputable to DEMCO. The magistrate judge, however, denied DEMCO's motion for summary judgment because genuine issues of material fact remained as to whether DEMCO's AAP and hiring practices violate Title VII. The magistrate judge found that, even though DEMCO is authorized by the RUS to take affirmative action to overcome the effects of prior discrimination, it had failed to show whether a "conspicuous [racial] imbalance" existed with respect to the particular job category at issue, justifying its minority hiring goals. More specifically, DEMCO "failed to present sufficient evidence regarding the purpose, duration, and effect of its affirmative action plan on third parties . . . ."

5

On July 31, 2006, DEMCO filed a second motion for summary judgment in which it presented additional evidence and arguments concerning the subject AAP and accompanying hiring policies in an effort to resolve the disputed issues of material fact discussed in the magistrate judge's prior ruling. Finding the newly presented evidence sufficient, on September 14, 2006, the magistrate judge issued an order granting DEMCO's second motion for summary judgment and entered judgment dismissing Sharkey's suit. The magistrate judge first determined that a genuine issue of material fact may exist as to whether Sharkey is able to establish a prima facie case of race-based discrimination under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Nevertheless, the magistrate judge found that the subject AAP provided a legitimate, nondiscriminatory rationale for the decision to hire McCray over the other applicants, including Sharkey. Further, the magistrate judge concluded that Sharkey did not satisfy his burden of proving that the subject AAP was invalid, and hence a pretextual justification for race-based discrimination.

On September 25, 2006, Sharkey filed a motion for new trial, which the magistrate judge construed as a motion to amend or alter judgment pursuant to Federal Rule of Civil Procedure 59(e). The magistrate judge denied Sharkey's motion on October 19, 2006. Sharkey then took this appeal.[5]

---

[5] As an initial matter, DEMCO contends that this court is without jurisdiction over Sharkey's appeal because his Notice of Appeal, filed on November 15, 2006, refers to "the final judgment of the Honorable Christine Noland, Magistrate Judge, dismissing Plaintiff's action via the granting of defendant's Motion for Summary Judgment on the 19th day of October, 2006." DEMCO asserts that the denial of a motion to alter or amend a judgment is not separately appealable from the judgment that it seeks to alter or amend. Because Sharkey references in his Notice of Appeal the magistrate judge's October 19, 2006, order denying his motion to alter or amend the judgment, but not the September 14, 2006, order and judgment granting DEMCO's motion for summary judgment and dismissing his suit, DEMCO argues that this court does not have jurisdiction to consider Sharkey's appeal.

## II. STANDARD OF REVIEW

We review a district court's summary judgment ruling de novo, applying the same standard as the district court. Wyatt v. Hunt Plywood Co., 297 F.3d 405, 408 (5th Cir. 2002). A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, this court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Hockman v. Westward Commc'ns, L.L.C., 407 F.3d 317, 325 (5th Cir. 2004). In reviewing the evidence, this court must therefore "refrain from making credibility determinations or weighing the evidence." Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007).

## III. DISCUSSION

Title VII prohibits an employer from failing or refusing to hire an individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove intentional

---

This argument is without merit. We have held that "a party does not forfeit the right to appeal by designating the wrong judgment if it is clear which judgment he is appealing." Osterberger v. Relocation Realty Serv. Corp., 921 F.2d 72, 73 (5th Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 181 (1962)); see also Sanabria v. United States, 437 U.S. 54, 68 n.21 (1978) (explaining that "[a] mistake in designating the judgment appealed from is not always fatal, so long as the intent to appeal from a specific ruling can fairly be inferred by probing the notice and the other party was not misled or prejudiced"). Sharkey stated in his Notice of Appeal that he was appealing the "final judgment . . . dismissing Plaintiff's action via the granting of defendant's motion for summary judgment . . . ." Although it is true that plaintiff provided an incorrect date for this order and judgment, it is nonetheless clear that he intended to appeal the September 14, 2006, order. Moreover, DEMCO has not asserted that it was somehow misled or otherwise prejudiced in any way by Sharkey's Notice of Appeal. Accordingly, Sharkey's Notice of Appeal was not defective, and we have jurisdiction over Sharkey's appeal of the magistrate judge's September 14, 2006, final judgment dismissing his suit by the grant of DEMCO's motion for summary judgment.

discrimination through either direct or circumstantial evidence. Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 219 (5th Cir. 2001). Where, as here, the plaintiff offers circumstantial evidence, we apply the familiar framework set forth in McDonnell Douglas. To prevail under that framework, the plaintiff must establish a prima facie case from which discrimination may be inferred. Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003). To establish this prima facie case, the plaintiff must show: (1) that he is a member of a protected class; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. See McDonnell Douglas, 411 U.S. at 802; Haynes v. Pennzoil Co., 207 F.3d 296, 300 (5th Cir. 2000). The burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the failure or refusal to hire the plaintiff. Laxton, 333 F.3d at 578. If the defendant meets its burden, the plaintiff then bears the ultimate burden of proving that the defendant's proffered legitimate nondiscriminatory reason is a pretext for discrimination. Id. To carry this burden, the plaintiff must rebut each nondiscriminatory reason articulated by the defendant. Id.

On appeal, DEMCO does not contest the district court's determination that it was not entitled to summary judgment on the ground that Sharkey is unable to prove the elements of his prima facie case.[6] Rather, assuming arguendo that

---

[6] We note here that the magistrate judge's denial of summary judgment on the issue of whether Sharkey could prove the elements of his prima facie case was proper, but not for the reasons provided below. The magistrate judge refused to grant summary judgment to DEMCO because she held that there was a genuine issue of material fact as to whether Sharkey was qualified for the Lineman Helper position. Specifically, DEMCO presented evidence below that it did not hire Sharkey because Mike Ballard, the person who would have been Sharkey's

Sharkey can prove the elements of his prima facie case of discrimination, DEMCO nonetheless contends that it has advanced a legitimate, nondiscriminatory rationale for hiring McCray, a minority, to fill the vacant Lineman Helper position. Namely, DEMCO asserts that its challenged employment decision was made pursuant to its internal hiring procedures, which included consideration of the subject AAP.

The Supreme Court has held that, in the Title VII context, the existence of an affirmative action plan can provide a legitimate, nondiscriminatory rationale for an employer's decision as contemplated by the analytical framework set forth in McDonnell Douglas. Johnson v. Transp. Agency, Santa Clara County, Calif., 480 U.S. 616, 626 (1987); see also United Steelworkers of Am. v. Weber, 443 U.S. 193, 208 (1979) ("We therefore hold that Title VII's prohibition . . . against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans."). Where, as here, an affirmative action plan is articulated as the basis for the employer's decision,

---

supervisor (and is now deceased), apparently told Martin, DEMCO's human resources manager, not to hire Sharkey because he was "obnoxious and arrogant." On this basis, DEMCO argued that Sharkey was not qualified for the position. In response, Sharkey presented evidence in the form of an unsworn declaration from an employee of DEMCO who worked with Ballard that Ballard in fact liked Sharkey and had wanted him to be hired to fill the vacant Lineman Helper position.

The magistrate judge should not have considered DEMCO's evidence, nor Sharkey's rebuttal evidence, when evaluating whether Sharkey could prove that he was qualified for the position as a necessary element of his prima facie case. We have stated that "[o]nly objective requirements may be used in making" the argument that a person is not qualified for a position. Johnson v. Louisiana, 351 F.3d 616, 622 (5th Cir. 2003). "Otherwise, an employer could 'utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process . . . is challenged as discriminatory.'" Id. (quoting Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 681 (5th Cir. 2001)). Because it is undisputed that Sharkey had achieved the minimum test scores necessary to be considered for the Lineman Helper position, that evidence should have been deemed sufficient to establish that Sharkey was qualified for the position, and accordingly to deny DEMCO's motion for summary judgment on this aspect of Sharkey's prima facie case.

"the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid." Johnson, 480 U.S. at 626. The Johnson Court further explained:

> As a practical matter, of course, an employer will generally seek to avoid a charge of pretext by presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.

Id. at 626-27.

To determine whether Sharkey has met his burden, we must look to the Supreme Court's decision in Weber, which "addressed the question whether the employer violated Title VII by adopting a voluntary affirmative action plan designed to 'eliminate manifest racial imbalances in traditionally segregated job categories.'" Id. at 627-28. There, the Court upheld the employer's decision to select less senior African-American applicants over the white respondent because the "purposes of the plan mirror those of [Title VII]." Weber, 443 U.S. at 208. The Weber Court explained: "Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to 'open employment opportunities for Negroes in occupations which have been traditionally closed to them.'" Id. (quoting 110 CONG. REC. 6548 (1964) (remarks of Sen. Humphrey)). In upholding the validity of the Weber employer's affirmative action plan, the Court noted the following: (1) the plan "[did] not unnecessarily trammel the interests of the white employees" as it "[did] not require the discharge of white workers and their replacement with new black hirees"; (2) the plan did not "create an absolute bar to the advancement of white employees" because half of those trained in the program were to be white; and

10

(3) "the plan [was] a temporary measure . . . not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." Id.; see also Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 470 F.3d 827, 840 (9th Cir. 2006) ("We recently distilled the Court's analysis this way: private employers' affirmative action plans (1) must respond to a manifest imbalance in the work force; (2) must not 'unnecessarily trammel[]' the rights of members of the non-preferred class or 'create an absolute bar to their advancement'; and (3) must do no more than is necessary to attain a balance."); Dallas Fire Fighters Ass'n v. City of Dallas, Tex., 150 F.3d 438, 442 (5th Cir. 1998) ("To determine the validity of the appointment we must examine whether it was justified by a manifest imbalance in a traditionally segregated job category and whether the appointment unnecessarily trammeled the rights of nonminorities or created an absolute bar to their advancement."). The Weber decision "was grounded in the recognition that voluntary employer action can play a crucial role in furthering Title VII's purpose of eliminating the effects of discrimination in the workplace, and that Title VII should not be read to thwart such efforts." Johnson, 480 U.S. at 630.

Analyzing DEMCO's subject AAP in light of Weber, we have no difficulty concluding that the subject AAP is valid, and thus can serve as DEMCO's legitimate, nondiscriminatory rationale for hiring McCray over other white candidates, including Sharkey. As an initial matter, Sharkey does not argue on appeal that there was not a manifest racial imbalance in DEMCO's workforce, or otherwise attempt to refute the magistrate judge's well-reasoned determination, in her order granting DEMCO's second motion for summary judgment, that no genuine issue of material fact existed as to whether there was a manifest racial imbalance in DEMCO's workforce, particularly as to the job

type in question.  It is axiomatic that issues not briefed on appeal are waived. See *Ruiz v. United States*, 160 F.3d 273, 275 (5th Cir. 1998).  Sharkey does argue on appeal that the subject AAP operated as an absolute bar to employment for white persons and that the subject AAP was not a temporary measure but rather a perpetual one.  We address each argument in turn.

To support his claim that the subject AAP served as an absolute bar to employment for white persons and/or unnecessarily trammeled their rights, Sharkey presented evidence below that DEMCO personnel, including two members of the board of directors, Sitman and Self, supposedly informed him that it was "futile" to apply for the Lineman Helper position because the position was reserved for African-American applicants.[7]  We have previously stated that "[e]mployers are liable under Title VII, in accordance with common law agency principles, for the acts of employees committed in the furtherance of the employer's business."  *Long v. Eastfield Coll.*, 88 F.3d 300, 306 (5th Cir. 1996) (citing *Moham v. Steego Corp.*, 3 F.3d 873, 876 (5th Cir. 1993), cert. denied, 510 U.S. 1197 (1994)). We have also stated that "[a]n oral statement exhibiting discriminatory animus may be used to demonstrate pretext or . . . it may be used as additional evidence of discrimination."  *Laxton*, 333 F.3d at 583 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000)).  Typically, but not always, the person with authority over the employment decision is the one who executes the action against the employee.  *Russell*, 235 F.3d at 226.  "If the

---

[7] This evidence was in the form of Sharkey's own deposition testimony.  He did not provide any affidavit or deposition testimony from any of the DEMCO employees or directors in support of his account of events.  Though not dispositive of the issue before us on appeal, we note here that we have previously accorded less weight in the summary judgment context to "[u]nsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law . . . ."  *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997).

employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker." Id. at 226-27 (citing, as examples, Long, 88 F.3d at 307; Hass v. ADVO Sys., Inc., 168 F.3d 732, 734 n.1 (5th Cir. 1999)).

Here, the magistrate judge determined that neither Sitman nor Self had actual or apparent authority to make their alleged statements on behalf of DEMCO. Accordingly, the magistrate judge found that their alleged statements were not imputable to DEMCO, and thus the statements could not be used to show the subject AAP and DEMCO's application/hiring process operated as an absolute bar to the advancement of whites or unnecessarily trammeled their rights.[8] On appeal, Sharkey conclusorily alleges in his brief that "[t]his position was held by a black person, and was held open for a black person simply because of race. The statements . . . by board members and generally known to the public suggest are [sic] very clear, persuasive evidence that this is a position for blacks only." Sharkey, however, apparently no longer contends that the statements of Sitman and Self are imputable to DEMCO, an argument which was made below and rejected by the magistrate judge. Sharkey certainly does not point to any evidence in the record that supports an inference that Sitman or Self had any influence or leverage over the employment decision at issue. Even if we were to find that Sharkey adequately presented this issue for appellate review, the unrebutted evidence in the record shows that the alleged statements were not imputable to DEMCO. Under Board Policy No. BD-2, which establishes the policy governing the relationship between the board of

---

[8] The magistrate judge reached the same conclusion as to the alleged statements by DEMCO employees.

directors and the general manager, the board of directors delegates to the general manager the "authority to hire capable personnel within established wage scales, train and supervise, and replace them." Accordingly, pursuant to this delegation of authority, the board of directors is not to exercise any decision-making authority concerning the hiring of DEMCO employees. BD-2 also provides that the directors are to "refrain, as individuals, from discussing management problems with the personnel of the corporation, except in cases where the board of directors may deem it necessary to confer with personnel at regular or special meetings of the board." Locklar, DEMCO's general manager, indicated in an affidavit that the Lineman Helper position was not discussed at any board of directors meeting between the date when it became vacant and the date when it was filled.

Additional evidence leads us to the conclusion that the subject AAP did not operate as an absolute bar to employment for whites or unnecessarily trammel their rights. DEMCO presented competent evidence in the form of the affidavit and deposition testimony of Martin, its human resources manager, indicating that its application and hiring process were nondiscriminatory. Specifically, the uncontroverted evidence establishes the following: "[t]hat selection of an employee by DEMCO entails consideration of his/her general background, education, training, experience, aptitude for a certain kind of work, character and probability of long term employment as per Board Policy No. LR-1"; "[t]hat DEMCO hires and promotes employees without regard to race, color, religion, sex, handicap, or national origin"; that all applicants must take the TABE and ATBs; that only candidates with a 'high' or 'medium' score are considered for interview based upon their qualifications; that candidates are selected for interview at DEMCO's sole discretion; "[t]hat an applicant's race does not appear on his/her application and that DEMCO can only ascertain the race of an

applicant at the time of interview, assuming it elects to interview the applicant"; that DEMCO received forty applications for the Lineman Helper position; that Sharkey and other white applicants were considered for the position; that Sharkey was not selected for an interview; that DEMCO interviewed multiple applicants, white and African-American, for the position; that DEMCO ultimately hired McCray, a African-American applicant, "because he scored a 'medium' on the test, had an engineering and electronics background with previous electronics experience in the wireless communications field, was an engineer in training, was a native and resident of Greensburg, had a clean driving record, and had previously worked at DEMCO in the summer of 1990 as a substation technician"; and that McCray, as a qualified minority applicant, enabled DEMCO to fulfill, in part, its hiring goal for Job Group 8-A for the year ending on August 31, 2003. Further, Martin testified at her deposition that a "hiring goal" of two African-Americans did not necessarily mean that DEMCO would hire two African-Americans to fill vacant positions. She stated that "I'm going to hire the two most qualified people that I can find."

Sharkey failed to controvert this evidence; in fact, he did not present any competent evidence that could create a genuine issue of material fact as to whether the subject AAP and DEMCO's concomitant application and hiring processes served as an absolute bar to the advancement of whites or unnecessarily trammeled their rights. Rather, the evidence before the magistrate judge on summary judgment showed quite clearly that DEMCO based its decision to hire McCray first and foremost on his qualifications and background. That McCray is African-American, and as such helped DEMCO fulfill in part its yearly goal under the subject AAP, was secondary. Consideration of McCray's race in this context, as a "plus" in addition to the applicant's qualifications, was therefore permissible. See Johnson, 480 U.S. at

15

638 (discussing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 316-19 (1978)). Moreover, the subject AAP did not result in or require the discharge of white employees and their replacement with new African-American hirees, nor is there any competent evidence that DEMCO would not or will not hire qualified white applicants for similar positions. Accordingly, we find that summary judgment was appropriate as to Sharkey's challenge of the subject AAP as an absolute bar to the advancement of whites or as unnecessarily trammeling their interests.

Turning to Sharkey's second argument against the validity of the subject AAP, Sharkey asserts that he presented sufficient evidence to create a genuine issue of material fact as to whether the subject AAP does more than is necessary to attain a racial balance because it is a perpetual, not a temporary, measure. See Weber, 443 U.S. at 208 (stating that "the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance"). Specifically, he points to evidence obtained during discovery showing that "in the more than ten years and fourteen hundred pages of [DEMCO] board minutes . . . , there is no discussion of affirmative action goals, there is no mention of approving the affirmative action plan, and, in fact, there is not even one single mention of the words 'affirmative action.'" Sharkey also references the deposition testimony of Martin, in which she stated that she had "never thought about not needing [an affirmative action plan]," and that any decision as to ending DEMCO's use of AAPs would likely be made in conjunction with RUS.

We do not find Sharkey's arguments compelling in this regard. First, our review of the proceedings below shows that Sharkey did not present any argument as to, or evidence of, the DEMCO board minutes to the magistrate judge through his oppositions to DEMCO's motions for summary judgment. In fact, the evidence concerning the DEMCO board minutes was not made a part

16

of the summary judgment record. Therefore, that evidence will not be considered here. See Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 (5th Cir. 1992) ("Although on summary judgment the record is reviewed de novo, this court, for obvious reasons, will not consider evidence or arguments that were not presented to the district court for its consideration in ruling on the motion."). As to the evidence that we will consider, namely Martin's deposition testimony, which was presented to the magistrate judge, this evidence, at most, merely establishes that DEMCO could not conclusively state when its use of one-year AAPs would end. It does not tend to show that the subject AAP was intended to maintain a racial balance, nor does it tend to prove that DEMCO's use of AAPs is of unlimited duration, particularly when viewed in the context of the uncontroverted evidence provided by DEMCO.

Specifically, it is undisputed that DEMCO prepares a new AAP each year to comply with the terms of its lending agreement with RUS, which, as a federal agency, requires DEMCO to meet its affirmative action obligations under Executive Order 11246. Section V of the subject AAP, entitled "Goals and Timetables," states that the "Utilization Analysis-Statistics and Goals sheets that are an integral part of this plan reflect the Corporation's Expected Goal Hires (goals) by August 31, 2003." The subject AAP expressly contemplated that job openings or newly established jobs, as they occur, were to be reviewed "in consonance with the minority . . . goals in the Corporation's goals and timetables." Those goals were based on detailed statistical analyses that calculated DEMCO's underutilization of minorities in its workforce for various job categories, using labor force and statistical availability data that was up-to-date as of the commencement of the subject AAP in 2002. DEMCO's minority hiring goals changed from year-to-year based on an annual reassessment of the company's underutilization of minorities in various areas of its workforce.

17

Moreover, these goals were precisely that – goals. The subject AAP did not mandate that DEMCO must hire a certain number of minorities for the 2002-03 period to fill specific positions. In fact, the subject AAP emphasized "employment of individuals who are qualified for the new or vacant positions," indicating that race was to be considered as a "plus" only if the applicant was otherwise qualified for the position. Thus, given the summary judgment record before us in this case, we find that Sharkey has not created a genuine issue of material fact as to whether the subject AAP was anything more than a temporary measure designed to eliminate a manifest racial imbalance in DEMCO's workforce.

In sum, Sharkey has presented insufficient evidence to carry his burden of proving that DEMCO's subject AAP was invalid, and hence its justification for not hiring him pretextual. Because Sharkey is unable to rebut this legitimate, nondiscriminatory rationale articulated by DEMCO for its employment decision concerning the vacant Lineman Helper position, we need not address DEMCO's other proffered reason for not interviewing Sharkey, i.e., that the person who would have supervised the new Lineman Helper did not like Sharkey and found him to be arrogant and obnoxious. See Laxton, 333 F.3d at 578 ("The plaintiff must rebut each nondiscriminatory reason articulated by the employer.") (emphasis added). While it may be true, in light of the evidence discussed supra note 6, that an issue of material fact exists as to whether that particular rationale offered by DEMCO was false or pretextual, it does not necessarily follow that all rationales articulated by DEMCO are by extension unworthy of credence. Otherwise, there would be no reason to require a plaintiff to rebut

each nondiscriminatory reason articulated by the employer.[9] Consequently, because the subject AAP was a legitimate, nondiscriminatory rationale for DEMCO's decision to hire an otherwise qualified African-American applicant, we conclude that summary judgment was appropriate as to Sharkey's reverse race discrimination claim under Title VII.

## IV. CONCLUSION

For these reasons, the magistrate judge's order and judgment granting DEMCO's motion for summary judgment and dismissing with prejudice Sharkey's claims are AFFIRMED.

---

[9] We find this rule particularly apt here given that the decision not to interview Sharkey was just one aspect of a lengthy hiring process that included interviews of several applicants, white and African-American, and ultimately resulted in the hiring of McCray several months later.